Good morning ladies and gentlemen. We have five cases before the court today. The last was submitted on the papers. The first four are going to be argued this morning. The first case before the court is Sociedad Espanola v. Blue Ridge X-Ray Company, case number 171551, an appeal from the Western District of North Carolina. There is a cross appeal in this case so I understand the parties want to divide up the argument to allow for that and we will try to do that to the extent that the issues are appropriately raised at the appropriate times and we'll try to give you the rebuttal that you've asked for. We can't always promise that. Okay. Mr. Rademacher, is that how you pronounce that? It is, Your Honor. Thank you. You may proceed. May it please the Court. An opening reference plaintiff is Sociedad Espanola. I often refer to it as SEDACL which is the acronym for the company name so I just want to make sure there's not any confusion when I say SEDACL today. May it please the Court. The district court views its discretion in denying enhancement by making an error of judgment and or erroneous factual conclusions in three different ways. First, the court focused on late conjured offenses by the defendant, defenses at trial rather than taking instruction from HALO and focusing upon the conduct of the challenged activity. We're not talking about willfulness. That has been determined so the question is enhancement, separate aspect if you will, and why aren't all the circumstances, the totality of circumstances appropriate to consider in whether a case is exceptional? Certainly, as HALO would tell us, the totality of circumstances are egregious, I should say. Pardon? Egregious. The egregiousness in this case harkens back to what the court turned a blind eye to, frankly. That is the willful copying, the purposeful planned effort to copy the technology and functionality of SEDACL's patented product. Knowing it was patented. But she accepted that willfulness finding from the jury. I'm sorry. He accepted the finding from the jury and then he went on as HALO, I think, instructs him to do and still consider in addition to that willfulness finding whether this was an exceptional case and or egregious enough to warrant enhanced damages. True. And we're here to determine whether or not that was abuse of discretion in what the court looked at, looking at the evidence that was available in trial. With respect to egregiousness, let's go back to where you started. In HALO, the court said we're to look to the point in time when infringement occurs. And HALO never mentions the word willfulness. So is it saying look to the point in time when infringement occurs for purposes of determining willfulness or for purposes of determining egregiousness? Well, I read HALO to and as well as how this court seems to have interpreted HALO under certain circumstances, such as in the Witsurf case. But I read HALO as saying Well, that was before. That was before HALO. But you look for egregious conduct, not run-of-the-mill cases or allegations where it's run-of-the-mill cases. And I believe Witsurf is one of the cases that sometimes this court has presented, or when there's alleged to be a culture of copying or there's copying of other products. Here, there is direct evidence of at the inception, when after knowing about Seticol's product was patented, at the inception of forming DRGMs for the product, the generator that would copy Seticol's technology. Sorry, egregiousness would certainly encompass litigation misconduct. Sure, but it doesn't absolve. No, no, but my point is that that is activity that takes place during the course of the litigation. The part that I'm focusing on, the copying, happened back in 2006. I'm with you on that, but the point I'm trying to make is that there may be different considerations to take into account when considering egregiousness in terms of an award of enhanced damages as compared with just a case where there was willful conduct. Well, there's two problems with what the court did. The first is what I was highlighting, that the court is turning a blind eye to that which occurred that shows that this is not just egregiousness, this is the pirate that HALO was talking about. But also, the court erred in just its factual conclusions. The court, we have to look at what the court said, that the defendants pressed legitimate defenses at a qualified patent attorney, and found that to be something that was indicative of turning, forgetting about the pirate that stole the technology, it seems. So, the fact is, though, all of those... Well, let me go back to the Bynum report, because, or is it Bynum or By-um, By-un? The first, the pre-suit... Byun. Byun? Yes. Byun, By-un? By-un is how they had said it. However, the jury had that before it, right? The jury, the Byun report, as they call it, we had filed a motion eliminating it. The court allowed it to wait to hear what the testimony would say, but we had sworn testimony of the CEO, the sole decision maker, that he never saw it. So, the jury knew it existed, the jury knew he never saw it, the jury was aware of all of that circumstance when it found willfulness. And, in fact, the witness came to trial recanting his prior testimony, seeing the document again, or whatever he did, suddenly remembered that that's how he based his decision to go ahead and ship product that he had copied. It was, that's part of the absurdity of the situation, to find that credible, where the court said that it was, you know, that there was this evidence that a reasonable investigation had been done, and a good faith belief based upon this reasonable investigation, that it's invalid or not infringed. First of all, that's not what the document shows. Evidence showed that it never reached the decision maker, and I submit... But didn't you just say that he changed his testimony at court and said it did reach him? Right. I mean, I get you, it seems a little fishy to me, but he testified to that, the district court was there. Isn't that a clear error standard? And if there's testimony to support his decision, then what can we do? We can look to... Do we have to find, I mean, we have to essentially, you're asking us to overturn what sounds to me like a credibility determination. No, it's a totality of the circumstances, and it's looking at the evidence. Well, here's what I'm trying to get to. There is a credibility determination that the jury made, right? So the jury obviously must not have believed this changed testimony. So my question is, is it your view that the court is allowed to reject that credibility determination and make a different credibility determination in the context of 284? That's what I'm trying to figure out. What is the flexibility that the court has? Judge Romano, that is a poignant question because I'm troubled with the jury getting instructions where the then standard instructions, which included clear and convincing evidence, included instructions as to objective reasonableness when determining willfulness. The jury handily found willfulness, willful infringement. The judge came back on enhanced damages and made seemingly factual determinations entirely contrary to that. First of all, several of the factual determinations he's stating are wrong. There was not good faith arguments brought to trial that were the same as in the opinion of counsel that was post-suit opinion. And setting aside the factual determinations, it does seem that the district court went out of its way to running contrary to how the jury must have determined the facts in order to find willfulness, turned a blind eye to the pirate that stole this technology and built a company from four people to now one of the largest manufacturers. They developed the infringing product in a matter of weeks. You're into your report. I would like to reserve some time. Thank you. Mr. Magley? Yes, Your Honor. May it please the court, Richard Magley on behalf of defendants at DRGEM Corp, DRGEM USA, and Blue Ridge X-Ray. All right, let me ask you some questions about how this is supposed to work. HALO says you're supposed to look, for purposes of determining egregiousness, you're supposed to look at the point of infringement. All right, so if that's the case, then of what relevance is litigation conduct or litigation defenses to the overall inquiry? In HALO, they said there's no rigid rule, there's no rigid formula, and courts after HALO have, in this court, have applied the read factors. Infringement, we take a different view. They say, well, infringement, you only have to look at 2006 and 2007, which is years before they introduced the product to the U.S. market. And they're seeking egregiousness from 2010 to 2015. They're seeking enhanced damages for that time period. And logically, one of the things they really ignore is the fact that the district court initially granted summary judgment in the defendant's favor, finding non-infringement an invalidity. Right, but the district court was wrong. Correct. And so that's the problem. A district court can't say, I don't like the fact that the Federal Circuit overturned me, so I'm going to go back and say I was right all along. And some of that smacks of this, doesn't it? No, I think what it smacks of is the fact that this was a run of the new patent case where there was an open question on whether there was infringement or not. In most patent cases, oftentimes it comes down to claim interpretation. What does two insulated chambers mean? Does it require physical insulation? Well, the jury didn't seem to think it was much of an open question. Right, because that claim interpretation had already been decided. And as of now, once there was that adverse ruling, DRGEM removed the product from the market. They stopped importing. They didn't continue selling. There was no verdict. There was no judgment of infringement, yet they removed the product. And so taking to a logical conclusion, in January 2015, they're seeking enhancement for sales of, say, DRGEM made in January 2015. The status of the case at that time was they had a judgment from a district court of non-infringement and invalidity. But they're saying you should be subject to trouble damages potentially because you're an egregious pirate. Well, the jury found it to be willful, correct? Correct. And the jury had before it the Byam report, correct? Correct, but they did not have the district court's ruling of summary judgment in favor of DRGEM. But the question is, does the district court have the right to basically say, I am going to make different credibility determinations than did the jury? Well, first of all, I think two answers to that. Number one, I think on credibility, I think the district court will observe the witnesses directly are in better... Better than the jury? No, but asking this court to reevaluate the credibility, yes. And number two, I think to answer your question, there's two cases. First of all, Juergens, a federal circuit decision from this court that said that a district court can weigh factors like closest of the case that were not considered by the jury. So even though the jury... And then there's another case, AIA America. It came out after briefing was completed in this case. The site is 866 3rd at 1369. It says inequitable issues like enhancement. When there's sort of collateral issues separate and far from the decision on the merits, a district court can exercise its discretion and decide. Even if HALO and our precedent gives the district court some room to make differing or additional views, shouldn't the court at least be required to explain why, despite the willfulness finding, which covers all of these basic issues, that the court's coming to a different conclusion? And we believe the court did in this case. For example, it would explain not only the summary judgment... But he didn't. I mean, he just said the exact opposite without explaining why. If you look at... He did look at what would be sort of read factors. First of all, there's three that really aren't challenged. No litigation misconduct. No attempt to conceal. Have we said specifically that the read factors still apply after HALO? Has this court actually said that? We've referred to the read factors in passing, but we have never actually addressed the question of whether they continue to apply in full force after HALO and after COML. I'm trying to remember whether presidio applied the read factors or not. I think there are cases since HALO that have found willfulness but no enhancement, presidio being... Clearly, we've said that that's possible. And in fact, Setekov, they actually criticized the judge for not applying the read factors. In the district court's decision, they said, we're not going to just... There's no rigid formula. I don't care what they criticize the court for. I'm trying to figure out what the law is. Have we ever said the read factors in their original form still apply after HALO and COML? I'm not aware off the top of my head whether since HALO, this court has addressed the issue of whether read still applies after that. And what about COML? I mean, in COML, the Supreme Court very clearly said that validity and good faith belief in validity does not relate to the question of infringement. They went out of their way unanimously to tell us there are two separate sections of the statute, and the one doesn't impact the other except to wipe out liability at the end of the day. But whether infringement occurs and whether you have an intent to induce infringement is a different animal. Why wouldn't that apply to our willfulness jurisprudence? In the sense that it didn't extend to willfulness? In other words, if your question is, was the infringement willful, why is it relevant if there is a good faith belief that you might have a decent validity defense? I guess it goes into whether or not you're egregious or not. They are two separate issues, but if you look and you form a good faith belief and a reasonable belief that this patent is invalid, then the question is whether or not you're willful. The question is whether you're an egregious infringer, you're an egregious pirate, to the point where you should be subject to potentially troubled damages. And the fact of the matter is, if this is a run-of-the-mill patent case where you believe that the patent reasonably is invalid and you have a legitimate question about the validity, I don't think that should subject you to potential egregiousness. I don't think it should affect inducement either, but the Supreme Court reversed me and others on that issue. In Reed, even in Reed itself, it said these factors may apply. And in district courts, I'm not sure about the Fed Circuit, but in district courts they have been since HALO, been applying the Reed factors. And even this court in looking at, the district court in looking at egregiousness and weighing egregiousness, looked at, well, he said, I don't need to rigidly apply the Reed factors. He did apply things like litigation misconduct, closeness of the case that fit into a Reed factor. When you say closeness of the case, you don't dispute copying, do you? I don't dispute that copying, he acknowledged copying in his opinion. Personally, I don't think there was copying. I think they tried to make their product different. But in the district court's opinion, he acknowledged that there was a willfulness finding. He acknowledged that there was copying, and then he went through and acknowledged HALO and case law, and then went through and did explain why he was denying, in his discretion, enhancement. The jury deliberated for 20 minutes before it found infringement, right? Right, but I think that... That sort of indicates that the case wasn't that close. But at that time, the product had been ruled for market, and quite frankly, when the case really came down to, it was claim interpretation. And once there was an adverse ruling as my client, they took the product off the market. Now, they did still assert some defenses, one of which is it was their burden to prove infringement. And they moved for a JML, because their expert during trial testified that to really confirm infringement, you'd have to power up one of these transformers to the full power to know if it did what the PAC claims said it would. And he said he never did it. And that was sort of a close call. So they did have defenses there. But in terms of looking at, this was really a run-of-the-mill case that depended on claim construction. And in this court's prior opinion said these claims were no model of clarity. Clear claim drafting would have been more helpful. And that's true. There was an open, good-faith question as to whether insulated chambers required physical insulation or electrical insulation. There was an open question whether two magnetic cores meant entire cores or a subset. What do you have to say about your cross-appeal? On the damages, I think the first red flag is that the jury awarded nearly three times the amount of the only quantitative evidence in the record, which was the testimony of Mr. Jeffords. There was some discussion that the award was based on a cost-savings theory. I think we refer to that in the brief as reimagined testimony. Even that cost savings, part of the problem we have with Jeffords is he started with the end. He never really gave a starting point. He said, here's, you know, it's $500, at least $500, and then kind of did, similar to Witser, a superficial analysis of the Georgia-Pacific factors. Did he submit an expert report? He did, yes. I couldn't find it anyplace in the record. I don't think that was submitted on appeal. So he did submit it, and my understanding is... These generators, I mean, there were actual individual replacement sales, right? Correct. So putting aside the whole question of whether you look at the full product or you look at the individual piece, the individual piece was not often, it wasn't regularly sold, but for replacement was sold, correct? Correct, and there was... And there was a range of numbers for those sales. Correct. And this was... This number falls within that range, correct? The jury number. No, the jury number is actually... The jury number is 1432, and the sales are actually, like, the entire revenue, not profit, the entire revenue of a transformer. But it was higher than 1492. By a few dollars, yes. Well, 18-something, right? I thought, well, it could be. I think the low was 1459, and then it was up to 1800. So they were all above the jury number. Correct, but then you're portioning 100% of the revenue to a transformer, and there's no support in the record for that. I see I'm in my rebuttal time. No, I just want to clarify. Those sales numbers, they're for the price of the entire generator, not for the... So the price was for the transformer, the component. So they're for a replacement transformer. Yeah, for the component itself. Correct. If there's no further questions, I'd like to reserve a few minutes for rebuttal. Okay. Thank you. Can you start with the cross-appeal? Sure. I mean, we'll let you get back to your other point. So how do you respond to the fact that the jury reached a number that was higher than the proposal from your expert, Mr. Jeffers? Almost three times the number. Yes. I'm going to start with the criticism of Mr. Jeffers, what he provided the jury. Now, perhaps this is a different case than counsel or what you all sometimes see. This was an expert that used as his baseline, said he never gave a starting point. Yes, he did. He used something that is... Well, can you just get to the point? He testified that there was a floor, and then I guess you point to some arguments that here are additional considerations that may increase the price, but he didn't give any kind of range or guideline. How is that a permissible way of computing damages? Because he did give guidelines. What he gave was cost savings, which is just the bare bones, the materials and the shipping of the transformer, which is same as the generator. But he didn't give any quantitative guidelines, did he? He didn't. He gave the number as the cost savings, and he looked at the Georgia Pacific factors and apportioned, he said, so it would be at least $500 based on these points. He was sequestered from trial. All witnesses were sequestered from trial. He didn't have the benefit of the record showing the value of this patented technology, which dear Jim Full knows well the value that they acquired from it. And they didn't offer any expert testimony. They did not. And frankly, they never filed it. There is no expert report. They never filed a dower motion. They're criticizing after the fact some of the ways in which Jeffords provided guidelines. But there still has to be some support in the record for that number. Oh, I submit that there is support in the record for that number, Your Honor. There was explanation. But not from him. Yes, from him. He did not provide a percentage royalty. I mean, it seems oddly, a very odd way of providing an expert report on damages say here's the starting line. You can go upwards. Feel free. I mean, if he had gone to $10,000, clearly that would be reverse. If they had gone to $10,000, that would be reversible error, wouldn't it? Honestly, as we see it, he gave guidelines and assistance to the jury. It's the jury's determination based on all the evidence of which Mr. Jeffords was not going to have available and didn't have available. Right. So all that other evidence with respect to the numbers and how much they sold the transformer as individual units for, that was, the jury had that. And, sorry to interrupt, but the fact that we had evidence showing that they were discounting theirs to go $6,000 below setticle no matter what. $6,000. They were dumping in the market. We had evidence of that. They had copied. They didn't have any cost of R&D. All of this, the jury heard. The jury heard the relationship, the commercial relationship with the parties and heard from Mr. Jeffords, these are the things from the Georgia-Pacific factors that you should look to. I don't have that because I wasn't here, unfortunately, said Mr. Jeffords. Now, I heard counsel say that this was like a closed case and it was a run-on-the-mill case. This was not a run-on-the-mill case. This was so blatant that the evidence came in such a blatant copy and jumping into the market and becoming, and frankly, there could have been damage theories of lost profits, price erosion. Now, after the fact, to come back and say, oh, well, we're not happy because we don't like how Mr. Jeffords calculated this when they didn't provide any evidence contrary. There's evidence that the Transformers, those are replacement sales to customers that already bought one. That's not fair market value of that product. What Mr. Jeffords did was explain to the jury, I'm going to find the value of that technology. All I have before me is cost savings right now. Then the jury heard what the value of the technology is. Did Mr. Jeffords have before him the evidence of the dumping? No, he didn't have evidence of the, what I would call price erosion. He didn't have, we had located that. Undercutting price is what I'm talking about. We call it dumping in the trade context, but that's essentially what you're saying, right? That they dumped it into the market below price in order to capture the market. I would have to look back to whether or not he saw a deposition testimony where we were examining the witness. But frankly, the witness never would really admit too much. But I don't know if he had that. Okay. Is there any other questions with regard to the cross field? I would like to just jump back for one moment. Yeah, you only have about 45 seconds, so go ahead. First, I would like to, the question of where do we look in time? I asked the court to look back to WPIP case where it was observed by this court that timing does matter. According to HALO, we need to go back to the time that this began. And I heard counsel say, oh, they're trying to get treble damages during 2015. This case continued with infringement for seven years. They had infringed for seven years. The case went on for five years. Frankly, $850,000 is a drop in the bucket for what these companies, what DRGEM gained from continuing this infringement. All the while telling us that they had a quick fix that they could have done in a month, and they finally did late in the day. They traded on Sutterco technology, which gave them reliability, which gave them a jump in the market, directly undercut and dumped on pricing, and paid $850,000. And now they are the pirate that should be punished. Your Honor, before addressing damages, I do want to get back to one point you asked me about a case from this court where the read factors were post-HALO. It's an unpublished decision, but in this court's exergence case that came out in March of this year, this court indicated we cannot conclude that the district court abused its discretion in applying the read factors and declining to award enhanced damages. So I knew there was a case. In a non-presidential opinion? It's a non-presidential opinion, but it is a case from this court. Switching back to damages, for Jeffers on price erosion, I don't understand why he couldn't have talked to his clients and said, well, okay, how much have you dropped your price since they entered the market? I don't know why any of that couldn't have been – this qualitative evidence, why it couldn't be considered. Most of it came from the CEO of Sutterco or the marketing manager of Sutterco, so why they couldn't have dumped – Why didn't you submit an expert report? Because, quite frankly, this is – their own experts said this was less than a $300,000 case given what experts cost. From a cost standpoint, it's their burden of proof, and it just didn't make economic sense given that it's – quite frankly, there was only 595 units sold. There wasn't that many – and then if you're looking at, correctly, the transformer and the profits from the transformer, it's a small-dollar case. But why isn't the replacement transformers a sufficient number for the jury to rely on? Because it is – just like we think in laser dynamics where they said you should have perhaps relied on the upcharge of $29 for FaceTime, this is actual revenue going to the actual patented product, a transformer. It's not on a generator. It's on a transformer. And I actually, quite frankly, if anybody's ever bought anything, when you get a replacement part, actually the cost typically is higher because you're kind of – you need the replacement. You can't get a bargain for it. Aside from the fact that that's not in the record, I think that logically that doesn't make a lot of sense, that you charge your already existing clients more for a replacement part than you would if you were going to sell it on the open market? In my experience, that's a con. Okay, well, your experience and my experience apparently are not the same, and they don't matter. But to get back to the point, there is revenue. Both parties had sold replacement transformers, so they know what the revenue is. Set-A-Call certainly would know what profit they made on those replacement parts. You're not objecting to any of the jury instructions as it relates to damages, are you? No, we're just saying that the record doesn't support the award that the jury provided or made. They make up the point about the Dauber motion. Two cases have come to mind, both Laser Dynamics and Lucent. In Lucent, there was no Dauber motion, but it still was found not to be sufficient evidence, and the jury verdict was vacated. In Laser Dynamics, they found there was no pre-verdict challenge, but again, they vacated the damages award. So we don't think that's a preclusion. We filed the Rule 58 motion challenging the sufficiency. So we think we preserved it under Fourth Circuit law. If there's any other questions... Okay. No, I think you're out of time anyway. One second. Thank you. Jesus.